IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs November 7, 2006

**STATE OF TENNESSEE v. WILLIAM T. CARTER**

**Appeal from the Criminal Court for Shelby County**
**No. 02-04974    Paula Skahan, Judge**

---

**No. W2005-01872-CCA-R3-CD  - Filed July 24, 2007**

---

A Shelby County jury convicted the defendant, William T. Carter, of premeditated first-degree murder, *see* T.C.A. § 39-13-202(a)(1) (2006), felony murder, *see id*. § 39-13-202(a)(2), and aggravated robbery, *see id*. § 39-13-402(a)(2).  On appeal, the defendant challenges the sufficiency of the evidence regarding all three convictions.  He also asserts that the trial court erred in finding that he qualified as a dangerous offender regarding the aggravated robbery conviction and that the trial court erred in ordering him to serve the aggravated robbery sentence consecutively to his first-degree murder conviction.  We affirm the judgments of the trial court; however, we remand for the execution of a proper merger of the first degree murder findings of guilt.

**Tenn. R. App. P. 3; Judgments of the Criminal Court are Affirmed and Remanded.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Robert Wilson Jones, Shelby County Public Defender; and Karen Massey, Assistant Public Defender (at trial); and Tony N. Brayton, Assistant Public Defender (on appeal), for the Appellant, William T. Carter.

Robert E. Cooper, Jr., Attorney General & Reporter; Renee W. Turner, Assistant Attorney General; William L. Gibbons, District Attorney General; and James Lammey, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

At trial, Mary McGee, the victim's mother, testified that the defendant was living with the victim, Billy McGee, and that the defendant did some work for her during this time.  On May 27, 2002, the victim and the defendant came to Ms. Mary McGee's house for a barbeque; this was the last time that she saw the victim alive.

Ms. Mary McGee testified that from this day, the defendant had possession of the victim's "white four-door" car. The defendant came to Ms. Mary McGee's usual Sunday barbeque on Sunday, June 2, 2002, without the victim. When the defendant came to her house again on Wednesday, June 5, 2002, she asked him why he had the victim's car, and the defendant told her that the victim was out of town. Ms. Mary McGee instructed the defendant to leave the car and the keys with her. On Friday, June 7, 2002, the defendant returned to Ms. Mary McGee's house and told her that he had to take the car with him because the victim needed it for work.

On cross-examination, Ms. Mary McGee testified that the victim had been sick, and she encouraged him to see a doctor. She testified that she was unaware of the victim's cocaine problem, and she testified that the victim and the defendant got along.

Steve Cahill testified that he is the terminal manager of Milan Express, the trucking company where the victim worked as a truck driver. He testified that the victim was a "steady" employee, who did not normally miss work. However, the victim did not come to work on June 3, 2003. Thus, Mr. Cahill called the victim's mother and inquired of the victim's whereabouts. Mr. Cahill testified that the victim never returned to work and that the victim's last day at work was Friday, May 31, 2002.

Mr. Cahill further testified that the victim worked approximately 50 hours per week and was paid weekly at a rate of $15 or $16 per hour. He testified that the victim was paid Thursday, May 30.

On cross-examination, Mr. Cahill testified that he was unsure how much the victim was paid that day and that he was unaware how much money was being garnished from the victim's check to pay child support.

Kelvin McGee, the victim's brother, testified that the victim drove a 1985 Buick LeSabre, and he last saw the victim at Ms. Mary McGee's house on the Sunday of Memorial Day weekend. During this visit, the victim told Mr. Kelvin McGee that he was going to eject the defendant from his house because the defendant was not paying rent and that the victim felt he was "being used."

The following Wednesday, Mr. Kelvin McGee went by the victim's house at 3156 Mensi Street because Mr. Kelvin McGee learned that the victim missed work, and the defendant informed him that the victim was out of town. Mr. Kelvin McGee did not see the victim's car in the driveway, and he noticed that the windows of the victim's house were "sweaty." Mr. Kelvin McGee testified that a girl who lived near the victim told him that she saw the defendant driving the victim's car.

Mr. Kelvin McGee also testified that two or three weeks prior to last seeing the victim, he loaned the victim a garden tiller. When the police officers released the victim's house to the family after their investigation, Mr. Kelvin McGee testified that the tiller was not there. He then

identified several items that had belonged to the victim, including clothing, a Zenith video cassette recorder ("VCR"), and a lunch box.

On cross-examination, Mr. Kelvin McGee testified that he knew a woman named Erica Robinson and that he assumed the items he identified had been found in her apartment. He testified that the victim had a relationship with Ms. Robinson, but he did not know whether they ingested drugs together. He also testified that he knew that the victim associated with "crack whores."

Veronica McGee, the victim's sister, testified that she knew the defendant and Ms. Robinson. Although Ms. Robinson was not dating the victim, Ms. Veronica McGee testified that Ms. Robinson and the victim were friends.

After Memorial Day, but prior to June 9, 2002, when the victim's body was found, Ms. Veronica McGee saw the defendant at Ms. Mary McGee's house, at her own house, and while he was driving the victim's car down the road. She testified that on Wednesday, the defendant left the car at Ms. Mary McGee's house at her mother's request, but the defendant picked it up again the following Friday.

On cross-examination, Ms. Veronica McGee testified that she did not remember taking the defendant and Ms. Robinson to the victim's house so the defendant could get a check. She also testified that she was unaware of any animosity between the defendant and the victim.

Johnny Lee Ward, the victim's neighbor, who lived at 3175 Mensi Street, testified that the victim was a good neighbor. Mr. Ward testified that the victim would not let others drive his car. On Saturday, June 8, 2002, Mr. Ward saw the defendant exit the victim's house. He asked the defendant the whereabouts of the victim because Mr. Ward had not seen the victim the entire week. The defendant told him that he took the victim to Ms. Mary McGee's house because he was sick. He then got into the victim's car and left.

Stephon McGee, the victim's nephew, testified that he last saw the victim at Ms. Mary McGee's house, and the victim said, in front of the defendant, that "he was tired of supporting a grown man, and he was going to put [the defendant] out." After that day, Mr. Stephon McGee heard the defendant say that the victim was out of town with a girlfriend; however, no one had seen or heard from the victim in a week. During that week, Mr. Stephon McGee stopped by the victim's house several times. He saw the victim's car at Ms. Mary McGee's house but never saw the defendant actually drive it, although Mr. Stephon McGee testified that the victim never let anyone drive his car.

Finally, on Sunday, June 9, 2002, he stopped by with his two sons and his cousin, Torrance Williams, and Mr. Stephon McGee entered the victim's house through a side window. He testified that when he entered, the house was very cold, and he smelled a strange odor. After he unlocked the side door for Mr. Williams, his sons, and Ms. Lillie Smith, the victim's neighbor, he

entered the victim's bedroom. He lifted a sheet at the foot of the victim's bed and found his uncle dead with his hands and feet tied. The victim had bruises on his back and a hole in his head. Mr. Stephon McGee also testified that the room was in disarray. Upon the discovery, he went to Ms. Smith's house and called the police.

Torrance Williams and Ms. Smith testified and corroborated Mr. Stephon McGee's testimony. Mr. Williams also testified that he saw the hole in the victim's head and that the room was "ransacked."

Memphis Police Officer Velynda Thayer testified that she was dispatched to the victim's house on June 9, 2002. Upon arrival, Mr. Stephon McGee and Mr. Williams informed her that the victim's body was inside. To verify, she entered the house and noticed it was "extremely cold." Officer Thayer testified that the house was "ransacked, especially the bedroom" where the body was located. She further testified that it looked like the body had been there for "quite some time." Officer Thayer called for backup and secured the perimeter.

Memphis Police Officer Kevin M. Shaver with the crime scene response unit testified that on June 10, 2002, a detective met him at 1543 Barton Street at the apartment of Erica Robinson. Ms. Robinson directed him to various items that had belonged to the victim, including the clothing, VCR, and lunch box previously identified by Mr. Kelvin McGee.

Memphis Police Crime Scene Investigator Eric Freeman testified that he arrived at the victim's house on June 9, 2002. He testified that the victim's hands and feet were bound and that there were blood stains in various locations around the bedroom, including on the carpet, a filing cabinet, two birthday cards, and a television antenna. Officer Freeman also took pictures and collected some papers from the bed, broken glass, a plastic bag located beside a weight machine, hammer, carpet runner, milk jug, and television. All of these items appeared to be blood-stained. In the hallway, he found a "clump of hair" and took pictures of what appeared to be blood. Officer Freeman also collected the linens from the bed, including pillows, the sheet that covered the victim's body, and the towel that covered the victim's face. Officer Freeman testified that the victim had bruises or "little nicks" on his back, and the victim's face appeared to be decomposing.

On cross-examination, Officer Freeman testified that he took pictures of everything but only collected items the detectives wanted. He testified that after collection, the evidence was taken to the Memphis Police Department's evidence room where it is then sent for fingerprint analysis or chemical processing.

Memphis Police Department employee Francis Donald Carpenter testified that he processed evidence from 3166 Mensi Street. He specifically remembered the birthday card. He used a chemical known as Hexine to develop a ridge detail on the card. He then sent the evidence to the latent fingerprint section to be identified. Mr. Carpenter also processed the filing cabinet and sent two or three fingerprints to the latent fingerprint section. Mr. Carpenter was not able to find

fingerprints on a tackle box, television, lunch box, milk jug, VCR, sheet rock, glass, or plastic card holders.

Memphis Police Department latent fingerprint examiner Nathan Gathwright testified that the fingerprint recovered from the birthday card matched the defendant's. Mr. Gathwright was unable to identify the fingerprints taken from other objects.

Tennessee Bureau of Investigation agent and serologist Qadriyyah Debnam testified that she was unable to extract deoxyribonucleic acid ("DNA") from the blood sample taken from the victim's body because an insufficient amount was recovered for analysis. Agent Debnam explained that certain environmental elements may also degrade the DNA and not allow a profile to be taken. However, she testified that serologists can provide a DNA profile for someone by using the blood from that person's parents. Thus, she prepared a DNA profile from the blood samples taken from Mary McGee and Willie McGee, and Agent Debnam also prepared a DNA profile of the defendant.

Agent Debnam testified that the blood from the birthday card recovered from 3166 Mensi did not match the defendant's. She recovered a blood sample from the flat sheet found at 3166 Mensi, and it matched the donor of the blood on the birthday card. The comforter and fitted sheet recovered from 3166 Mensi contained blood from the birthday-card donor and blood from the defendant. Agent Debnam determined that blood found on the mild jug, magazine, pillow case, shirt, and pieces of mail recovered from 3166 Mensi had markers in common with the blood found on the birthday card, and she eliminated the defendant as the donor from some of these items. She also found blood on a plastic bag, but no profile was obtained.

Doctor Debra Cutter with Orchid Cell Mark testified that she analyzed whether Mary and Willie McGee were the biological parents of the donor of the blood found on the birthday card. She determined that it was 462 trillion times more likely than not that the birthday-card donor was the biological offspring of Mary and Willie McGee. Doctor Cutter testified that there was a 99.99 percent probability that the McGees are the biological parents of the birthday-card donor.

Albany New York Police Officer Frank Gallow testified that on June 22, 2002, he stopped the defendant in a Buick LeSabre for not wearing a seatbelt. The defendant failed to produce identification but identified himself as William Carter. Officer Gallow checked the defendant's name and the vehicle's license tag number in the police computer system, and he found that the defendant was wanted for the murder of the victim and that the car was registered to the victim. At that point, Officer Gallow arrested the defendant, and the Albany Police towed the vehicle to their secure lot. Officer Gallow further testified that he did not observe any wounds on the defendant.

Albany Police Investigator Josef Severance testified that he interviewed the defendant. The defendant said that he received permission to possess the victim's car from the victim's mother. He stated that he learned of the victim's death from the arresting officers.

Investigator Severance also collected the defendant's belongings from a hotel room and sent them to Memphis.

Shelby County Medical Examiner O'Brien Cleary (O. C.) Smith testified that he responded to the scene, took pictures, and assisted in gathering evidence. He stated that the temperature in the house was 60 degrees Fahrenheit and that there appeared to have been a disturbance in the victim's bedroom. He noted that several blood stains were found in the room. Doctor Smith also testified that the victim was bound at the wrists and ankles and that his body was in a "moderate state of decomposition." He testified that the victim had blood stains on his back and that the pattern matched a rug found at the scene, he had a laceration to the back of the head, and had a soiled towel put over his face.

On June 10, 2002, Dr. Smith and a colleague performed the victim's autopsy. Doctor Smith testified that the victim's facial features were disturbed due to decomposition, he had ligature marks on his ankles and wrists, and had various abrasions, scrapes, and bruises. In addition, the victim suffered skin lacerations to the back of the head and near the left eyebrow; he also suffered a broken nose.

The fluid stain found on the carpet where the victim's head lay was caused by blood from the victim's broken nose and facial laceration and bodily fluids produced in decomposition. Doctor Smith opined that the blood could have stained the carpet before and after the victim died. He also opined that the facial laceration occurred post-mortem. The laceration to the back of the victim's head and to the victim's shoulder occurred post-mortem. Doctor Smith testified that the various bruises occurred pre- and post-mortem.

Doctor Smith further testified that the victim's ankles were tied with a "drapery pull cord[] and some black socks," and his hands were tied with terry cloth material, electrical cord, and string. Doctor Smith testified that because of the "active bleeding into the skin" located under the ligatures, the victim was alive when his hands were tied.

Doctor Smith also testified that there was "compressive force applied to the tissues of the [victim's] neck sufficient to cause bleeding into the muscles[] and to the delicate tissues around the neck artery." He testified that the body was moderately decomposed, and due to the cold temperature of the house, decomposition was retarded. Doctor Smith determined that the victim had been dead for four to five days.

Doctor Smith concluded that the victim died as a result of multiple injuries, "primarily the strangulation, which is the compressive forces to the neck, as well as the injuries, the blunt force injuries, to the head, the laceration to the back of the head[,] and then some of the body abrasions." He reiterated that the actual cause of death was strangulation, and he stated that it would have taken a minimum of 90 seconds to strangle the defendant. After 90 seconds, the defendant would have become unconscious, but still alive, and he would have required medical resuscitation to survive. He further testified that the defendant must have received constant neck pressure for 90

seconds to become unconscious. If the pressure was ever stopped to where the defendant could have breathed, then the pressure would have had to been reapplied to cause unconsciousness. Doctor Smith stated that it was possible for the victim to have lived three to four minutes after becoming unconscious.

Doctor Smith also testified that the victim's blood contained .39 micrograms of cocaine per milliliter. On cross-examination, he testified that cocaine in the blood will decompose as the body decomposes. He stated that violent behavior associated with cocaine use begins when the user's blood contains .6 micrograms per milliliter, and he stated that the victim's blood could have contained more than .39 micrograms before decomposition. Doctor Smith also testified that "typical recreational [cocaine] use" results in a level of .1 or .2 micrograms per milliliter. He testified that cocaine use will make the heart more unstable even if the user does not experience a struggle. In addition, Dr. Smith testified that the victim's hands could have been tied while he was in the process of dying.

Harvey Leon French, who at the time of trial was serving a sentence for violation of probation, testified that he knew the victim, the defendant, and Erica Robinson. Mr. French testified that, in June 2002, three or four days before he learned of the victim's death, he met the defendant at Ms. Robinson's room at 1543 Barton Street. During the following three or four days, the defendant drove Mr. French in a white Buick to various stores so Mr. French could shoplift and then buy cocaine with the proceeds from the stolen goods. On one such occasion, the defendant stopped at the victim's house, and Mr. French went inside with the defendant and a female companion. Mr. French testified that the house was cold and dark inside, and he never left the den. He observed the defendant retrieve clothes from "[t]he room that was facing straight down the hall."

Mr. French also testified that during this time frame, he saw the defendant trying to sell items, including tools, a garden tiller, and a car jack, from the white Buick. On Sunday following the visit to the victim's home, Mr. French learned of the victim's death while he sat in Ms. Robinson's room in the presence of Ms. Robinson and the defendant.

Erica Robinson, who at the time of trial was confined at a correctional center on a drug charge, testified that she had known the victim for eight or nine months and had known the defendant for two months. She testified that she had sexual relations with the men in exchange for money or cocaine.

Ms. Robinson last saw the victim on June 1 at his house. She, the defendant, and Ms. Veronica McGee went to the victim's house so the defendant could pick up a check. Ms. Veronica McGee left the defendant and Ms. Robinson there, and the victim, the defendant, and Ms. Robinson smoked crack cocaine. Ms. Robinson and the victim then had sexual intercourse in the victim's bedroom. After they had sex, the victim told the defendant to take his car and bank card to retrieve money from an automated teller machine ("ATM") to buy more drugs. Ms. Robinson testified that the victim's letting the defendant drive the victim's car was unusual. The defendant was gone for 25 to 30 minutes and returned with money and drugs. The three smoked more crack cocaine.

The defendant then took Ms. Robinson back to her room on Barton, and he stayed at her room for 10 to 15 minutes before leaving. Ms. Robinson testified that she assumed he was going back to the victim's house, and he had told her that he would be back in 30 minutes. However, the defendant came back to Ms. Robinson's room after a few hours, driving the victim's car. When the defendant changed his clothes, Ms. Robinson noticed lacerations on the defendant's neck, chest, and back. He told her, we discern, that her the lacerations came from cutting a tree.

The next day, Sunday, Ms. Robinson went with the defendant in the victim's car back to the victim's house. She testified that it was dark and cold inside the house and that she stayed in the living room. When she asked about the victim's whereabouts, the defendant told her that he was on a fishing trip. At the house, they had sex and left after a couple of hours. After that day, she did not return to the victim's house, and the defendant stayed at her room the entire week. He brought to her room clothes and a VCR. During this week, Mr. French also stayed with Ms. Robinson, and she corroborated Mr. French's testimony that he and the defendant would shoplift for drug money.

The next Sunday, June 9, 2002, Ms. Robinson received a telephone call from Ms. Veronica McGee's boyfriend informing her of the victim's death. Mr. French and the defendant were present when she received the call, and the defendant questioned her on the details. The defendant then told her that he was going to visit the victim's mother, and she never saw the defendant again although he did call her. Ms. Robinson asked the defendant why he hurt the victim, and the defendant replied that he did not mean to.

On cross-examination, Ms. Robinson testified that when the defendant left at the victim's request to get money and more drugs, she and the victim continued to smoke crack cocaine. She also testified that the scratches she saw on the defendant were "pretty deep," but the defendant did not seem to be in pain although he was "nervous." Ms. Robinson also testified that the defendant brought the clothes and the VCR to her room the night she last saw the victim alive.

Robert Cannon, the defendant's brother, testified on the defendant's behalf that he last saw the defendant Thursday, Friday, or Saturday of the first week in June. He testified that the defendant had a "deep gash on his neck" and that "[i]t appeared that he had been fighting." On cross-examination, he testified that he did not see any stitches.

The jury convicted the defendant of premeditated first-degree murder, *see* T.C.A. § 39-13-202(a)(1) (2006), felony murder, *see id*. § 39-13-202(a)(2), and aggravated robbery, *see id*. § 39-13-402(a)(2), and the trial court sentenced him to life with the possibility of parole for first-degree murder. After an evidentiary hearing, the trial court further sentenced the defendant to 18 years for the aggravated robbery conviction to run consecutively to the first-degree murder life sentence. The defendant then filed a timely notice of appeal challenging the sufficiency of the evidence for all three convictions and claiming that the trial court erred in running his sentences consecutively to each other.

*I. Sufficiency of the Convicting Evidence*

The defendant challenges the sufficiency of the evidence regarding each conviction. We will discuss each conviction in turn after addressing our standard of review.

When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). The rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *Winters*, 137 S.W.3d at 654.

In determining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id*. at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id*.

*A. Premeditated Murder*

Tennessee Code Annotated section 39-13-202(a)(1) provides that "[f]irst degree murder is . . . [a] premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2006). "'[P]remeditation' is an act done after the exercise of reflection and judgment." *Id*. § 39-13-202(d).

Proof of premeditation is inherently circumstantial. The trier of fact cannot speculate what was in the killer's mind, so the existence of premeditation must be determined from the defendant's conduct in light of the circumstances surrounding the crime. *See State v. Johnny Wright*, No. 01C01-9503-CC-00093, slip op. at 9 (Tenn. Crim. App., Nashville, Jan. 5, 1996). Thus, in evaluating the sufficiency of proof of premeditation, the appellate court may look to the circumstances surrounding the killing. *See, e.g., State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Coulter*, 67 S.W.3d 3, 72 (Tenn. Crim. App. 2001). Such circumstances may include "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660. Although the infliction of multiple blows to the victim is not alone sufficient to establish premeditation, *see State v. Brown*, 836 S.W.2d 530, 541-43 (Tenn. 1992), repeated blows that evidence the particularly brutal nature of the killing are supportive of a jury's finding of premeditation, *see State v. Sims*, 45 S.W.3d 1, 8 (Tenn. 2001).

Here, there was evidence of repeated blows, and the defendant acted calmly after the crime by turning down the air conditioning and by continuing to have contact with the victim's family, telling them that the victim was out of town.

More important, however, is the manner in which the defendant was killed. Doctor Smith testified that the cause of death was strangulation. He further testified that it would take a minimum of 90 seconds for the victim to become unconscious. Even after unconsciousness, the victim could have been resuscitated. However, the evidence showed that the defendant instead tied the victim and left him to die and decompose in the house.

Because of the nature of the killing, the repeated blows, and the defendant's calm demeanor after the killing, we hold the evidence sufficient to support a verdict of guilty of premeditated murder. *See State v. Brimmer*, 876 S.W.2d 75, 81 (Tenn. 1994) (holding evidence of premeditated first degree murder sufficient where the defendant handcuffed the victim to a tree and choked him to death with a wire and slipknot; the defendant then took the victim's possessions, was seen shortly after the murder with these possessions, and was ultimately apprehended in another state driving the victim's vehicle); *State v. Issac Scott*, No. W2005-02902-CCA-R3-CD, slip op. at 6-7 (Tenn. Crim. App., Jackson, Dec. 28, 2006) (holding evidence of premeditated first degree murder sufficient, despite defendant's claims of self-defense, where the defendant strangled the unarmed victim for at least 90 seconds, attempted to hide evidence of the killing by placing body in a culvert, and "failed to render aid to the victim").

*B. Aggravated Robbery*

As relevant to this case, Tennessee Code Annotated section 39-13-401 provides that "[r]obbery is the intentional or knowing theft of property from the person of another by violence or putting the other person in fear." T.C.A. § 39-13-401 (2006). "Aggravated robbery is robbery as defined in § 39-13-401 . . . [w]here the victim suffers serious bodily injury." T.C.A. § 39-13-402(a)(2).

The defendant argues that the only evidence proving that property was taken from the victim is testimony identifying property taken from the defendant as the victim's.

First, the evidence showed that the victim had possession of his car, tiller, clothing, and VCR prior to his murder. Second, the victim was beaten and strangled. Third, the defendant possessed the victim's car shortly after the murder and even after the victim's body was found. Also, Ms. Robinson testified that the defendant brought a VCR and clothing to her room shortly after the last time she saw the victim, and the items were identified at trial as having belonged to the victim. Furthermore, the tiller could not be located at the victim's house after his death, and Mr. French testified that he saw the defendant trying to sell a tiller out of the victim's car days after the victim was last seen alive. After considering the evidence in the light most favorable to the prosecution, we hold that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See State v. Billy Joe Carter*, No. E2005-01282-CCA-R3-CD, slip op. at 11

(Tenn. Crim. App., Knoxville, May 24, 2007) (finding the evidence sufficient when the victim's belongings were found in the defendant's possession shortly after the crime).

## C. Felony Murder

Tennessee Code Annotated section 39-13-202(a)(2) provides that "[f]irst degree murder is . . . [a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery." T.C.A. § 39-13-202(a)(2). The killing may precede, coincide with, or follow the predicate felony and still be considered as occurring "in the perpetration of" the felony offense, so long as there was a connection in time, place, and continuity of action. *State v. Buggs*, 995 S.W.2d 102, 106 (Tenn. 1999).

In the present case, the jury rejected the defendant's theory of self-defense and his claim that he had permission to possess the victim's car. The jury heard the evidence and could have reasonably inferred that the defendant killed the victim in the perpetration of the robbery. Therefore, we hold that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Billy Joe Carter*, slip op. at 12 (upholding felony murder conviction despite self-defense theory and claimed permission to possess victim's property).

## II. Sentencing

At the sentencing hearing, the State entered into evidence several certified copies of the defendant's past convictions and argued that the defendant qualified as a Range II offender. The defendant testified on his own behalf that he was a Range II offender. He further stated that his use of cocaine on the night of the murder was a "big motivator" for the crime.

The trial court found the circumstances surrounding the case "horrible" because, to gain access to the victim's ATM card and belongings, the defendant beat the victim, tied up the victim, left the victim in the house, took the victim's possessions, and returned to the house several times after the victim's death. The court considered the enhancement factor that the defendant had a history of criminal convictions, *see* T.C.A. § 40-35-114(1) (2006), and stated that the defendant had been "in and out of trouble since he was . . . 18," getting high on crack cocaine. The court also found that the defendant was a dangerous offender, who indicated little or no regard for human life, that the circumstances surrounding the offense were aggravated, that confinement was necessary to protect the public, and that the aggregate length of the sentence imposed reasonably related to the offense.[1] Thus, the trial court sentenced the defendant to 18 years as a Range II, multiple offender for the aggravated burglary conviction to run consecutively to his life-with-parole sentence for first-degree murder.

---

[1] Regarding this finding, the defendant argued in his brief that the court considered "non statutory factors in determining whether to impose consecutive sentencing," namely that the trial court stated its concern that if the legislature changed the 51 year mandatory service requirement for his first degree murder conviction, then the defendant would not have to serve 51 years before being eligible for parole. We discern that the trial court stated this concern in assessing whether the aggregate length of the sentence imposed reasonably related to the offense.

On appeal, the defendant claims that the trial court erred in finding that he qualified as a dangerous offender and in ordering consecutive sentences.

When there is a challenge to the manner of service of a sentence, it is the duty of this court to conduct a de novo review of the record with a presumption that the determinations made by the trial court are correct. T.C.A. § 40-35-401(d) (2006). This presumption is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). The burden of showing that the sentence is improper is upon the appellant. *Id*. In the event the record fails to demonstrate the required consideration by the trial court, review of the sentence is purely de novo. *Id*. If appellate review, however, reflects that the trial court properly considered all relevant factors and its findings of fact are adequately supported by the record, this court must affirm the sentence, "even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

The mechanics of arriving at an appropriate sentence are spelled out in the Criminal Sentencing Reform Act of 1989. The court is required to consider (1) the evidence, if any, received at the trial and the sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct involved, (5) evidence and information offered by the parties on the enhancement and mitigating factors, (6) any statements the defendant wishes to make in the defendant's behalf about sentencing, and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-210(a), (b), -35-103(5) (2006).

When a defendant is convicted of multiple crimes, the trial court, in its discretion, may order the sentences to run consecutively if it finds by a preponderance of the evidence that a defendant falls into one of seven categories listed in Tennessee Code Annotated section 40-35-115. They are:

> (1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;
>
> (2) The defendant is an offender whose record of criminal activity is extensive;
>
> (3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;
>
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

T.C.A. § 40-35-115(b) (2006). The existence of a single category is sufficient to warrant the imposition of consecutive sentences, *see State v. Adams*, 973 S.W.2d 224, 231 (Tenn. Crim. App. 1997), and indeed, "[e]xtensive criminal history alone will support consecutive sentencing," *id*. In *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995), the supreme court imposed two additional requirements for consecutive sentencing when the "dangerous offender" category is used; the court must find consecutive sentences are reasonably related to the severity of the offenses committed and are necessary to protect the public from further criminal conduct. *Id*. at 937-39; *see State v. Imfeld*, 70 S.W.3d 698, 707-08 (Tenn. 2002).

Here, the trial court found the defendant qualified as a dangerous offender, and we agree. The defendant beat and strangled the victim and left the victim's body to decompose in the victim's house, all the while, lying to the victim's family as to the victim's whereabouts. During this time period he revisited the house and possessed the victim's car. Also, the defendant apparently tried to cover his crime by turning the air conditioner on to retard decomposition. The defendant's "behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high."

Furthermore, although the trial court did not base its decision on factor (2), we note that the defendant's "record of criminal activity is extensive" and sufficient, in and of itself, to justify the imposition of consecutive sentencing. *See State v. Andre Dotson*, No. W2005-01594-CCA-R3-CD, slip op. at 21 (Tenn. Crim. App., Jackson, Nov. 29, 2006) (upholding consecutive sentencing because of defendant's extensive criminal history alone). The trial court found the defendant had been convicted of several felonies, receiving stolen property in 1980; third degree burglary in 1981, 1983, and 1985; and unlawful possession of a controlled substance in 1994. The record also indicates the defendant was convicted of being a persistent felon and of misdemeanor convictions.

### III. Conclusion

For the foregoing reasons, we affirm the judgments of the trial court; however, we remand for the execution of a proper merger of the first degree murder findings of guilt.

_____
JAMES CURWOOD WITT, JR., JUDGE